**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ROBERT F. KEESE III<br>　　　　Plaintiff<br><br>v.<br><br>M/V *PANORMOS*, her engines, tackle,<br>machinery, appurtenances, apparel and<br>freight, etc., *in rem*, and MARMARAS<br>NAVIGATION, LTD., and BANTEL<br>SHIPPING COMPANY, LTD., *in personam*,<br>　　　　Defendants | CIVIL ACTION NO. **05-10343-GAO** |

**JOINT PRE-TRIAL MEMORANDUM**

Pursuant to L.R. 16.5, the parties submit this Joint Pretrial Memorandum.

1. 　　Concise summary of the evidence

　　a. 　　Plaintiff

Robert Keese owns a scallop boat — then named *Rebecca Nicole*, now named

*Beggar's Banquet* — with which he scallops actively out of Chatham. On February 20,

2003, he was scalloping off of Chatham at about six o'clock in the evening with three

crew members. His engine overheated and set off an alarm. He shut it down to

prevent it from seizing up and leaving his boat helpless, and so he could diagnose and

correct the problem. His massive scallop dredge was still on the bottom, connected

to his boat by a heavy towing wire.

　　The visibility was unlimited. Mr. Keese switched on the "not under command"

lights called for by the International Rules of the Road, which applied at this location.

He was able to see the lights of a large ship some miles distant, far enough away to be

able easily to avoid him with few degrees change of course, especially since there was plenty of sea room.

As he and his brother worked to remedy the engine problem, he kept an eye on this ship. He made several hails on the radio — on the international radio calling frequency, channel 16 VHF-FM (Very High Frequency – Frequency Modulation), the proper channel for such calls — in order to insure that the ship was alerted to his presence. But there was no response from the ship.

As the ship drew closer it did not appear to be altering its course, despite the fact that there was plenty of sea-room to allow her to ease her southerly course to the right (and to the west) and thereby avoid all anxiety. So Mr. Keese also flashed a million-candlepower searchlight across the windows of the bridge of the ship, because its course was shaping up to be too close for comfort. There was no response or reaction of any kind, and the ship never altered its course or speed.

The problem with the engine was that a cooling hose had come loose, and had pumped the coolant into the bilge. Mr. Keese and his brother had to locate the problem, reach the hose, get it secured properly, locate the spare coolant, and refill the cooling system. This was the only course of action available to them. As the ship continued to bear down on them, they completed this and started the engine.

At that point, the *Rebecca Nicole* was very slightly to the east of the centerline of the ship, and her bow was pointed to the east (thus displaying to the ship the red sidelight of the *Rebecca Nicole* ).

Mr. Keese gunned the engine and steered to the east to try to get clear of the path of the ship — the only direction available to him. Trying to go the other direction would have risked fouling his propeller with the tow wire, leaving him dead in the water, and as helpless as before the engine restarted. To do so would also have required him to try to turn around and then cross the path of the ship, which would also have presented the risk that the ship could have caught the tow wire of the scallop dredge and dragged the *Rebecca Nicole* under.

He almost made it. But the port bow of the ship caught his port outrigger and spun the bow of the *Rebecca Nicole* around into the hull of the ship, where it scraped along the hull as it passed, and tore up the bow of the *Rebecca Nicole*. His inverter was knocked loose from where it was installed on his bulkheads, and his outriggers and superstructure were damaged.

The ship was the defendant vessel *Panormos*. It never stopped, slowed, or changed its course, despite having a properly lit, helpless vessel in its path in conditions of unrestricted visibility. The sole cause of the collision was the lapses of the *Panormos*.

Fortunately, no one on board suffered any personal injury. Mr. Keese hauled up his dredge, and started back to Chatham. His radio was knocked out by the impact of the collision, but once he came within cellphone range, he arranged for someone ashore to contact the Coast Guard to report the situation.

Shortly afterwards, he took his vessel to a yard for repairs. It was out of service until May 1, 2003. Mr. Keese lost the ability to go scalloping during this time, and lost all of the associated income. The repairs cost $40,302.39, and the lost net income during the repair period was $18,033.75. These amounts are subject to pre-judgment interest; assuming 3% per annum, the aggregate value is $67,961.60

The downtime also cost Mr. Keese 6,000 pounds of scallops landing history in the records of the National Marine Fisheries Service ("NMFS"). This was especially significant in terms of his future income.

Mr. Keese is in the process of being awarded a scalloping permit under the regulations of NMFS. This is part of the transition to what is called a "limited access" regulatory regime for the General Category scallop fishery, under what is known as Amendment 11.

As matters stand, Mr. Keese one of the limited group of today's scallopers who will receive a NMFS permit to harvest scallops in the future. His permit will allow him to harvest scallops up to a yearly limit set by the NMFS regulations — his Individual Fishing Quota ("IFQ"). No one without such a permit will be allowed to land and sell scallops.

The amount of Mr. Keese's IFQ will be directly proportional to his documented landings of 41,593 pounds of scallops during 2003. But for the collision, his NMFS permit under Amendment 11 would have been based on a 2003 history

that was 6,000 pounds greater, at 47,593 pounds — and his future IFQs would be larger in direct proportion.

Beginning in 2009 or no later than 2010, the lack of the 2003 history will mean an estimated shortfall in Mr. Keese's IFQ of 3,294 pounds or more of scallop landings, resulting in a shortfall of gross fishing revenue of not less than $24,210.90 and net fishing revenue of not less than $14,390.76 each year.

His NMFS fishing permit and its annual IFQs are a perpetual right, transferable, for example, to his son upon his death or retirement. Assuming a defendant-favorable long-term average interest rate of 5%, it would take an investment of $287,815 to generate the net annual revenue that he will lose as a result of the collision. Assuming that the collision-related effect on Mr. Keese's income first takes effect in 2010, the foregoing event would be reduced to present value by the use of a current interest rate of 3%, resulting in a capitalization of the loss of future income of $275,421.20. This amount, added to the above sum of $67,961.60 equals $343,382.80, the total of the plaintiff's damages.

b.   Defendant

The Casualty.   The collision occurred at approximately 1815 hours (6:15 p.m.) on February 20, 2003, in the southbound lane of the vessel Traffic Separation Scheme east of Cape Cod, Massachusetts. Shortly before the incident, the plaintiff had been dredging for scallops, operating his vessel in a northerly direction in the southbound vessel traffic lane. At approximately 1800 hours, an alarm sounded on board the

fishing vessel, indicating that the engine was overheating.  About five minutes earlier, plaintiff had observed on his radar (which was set to a range of eight miles) a vessel proceeding southbound in the traffic lane toward his location.  When he heard the alarm, the plaintiff shutdown the REBECCA NICOLE'S engine and sent his brother to determine the cause of the engine problem, which was found to be a loose coolant hose clamp.  By approximately 1813 hours the hose clamp had been tightened and coolant had been added to the engine.

During the period that his brother was working on the engine, the plaintiff was aware that the vessel he had observed earlier on the radar was continuing to proceed toward the REBECCA NICOLE with no apparent change in course or speed. Plaintiff claims that he attempted, without success, to contact the oncoming vessel by radio.  He did not check to see if the two red lights on the mast (indicating that the fishing vessel was not under command) were burning.  He also did not attempt to signal the oncoming vessel by igniting the flares on board the REBECCA NICOLE or by using the horn on board to sound the danger signal.  Once the coolant had been added, the plaintiff started the REBECCA NICOLE'S engine.  At that point, contact with the oncoming vessel was imminent.  The plaintiff steered the vessel to starboard and the port bow of the fishing vessel made contact with the port bow of the oncoming vessel.  Following the incident, the REBECCA NICOLE proceeded under her own power back to port in Chatham.

The evidence will show that at all times relevant to this action, personnel on board the PANORMOS maintained a lookout for other vessels. The ship's radar was operating properly, and although some fishing vessels were observed on the radar, none were seen in the traffic lane. The REBECCA NICOLE is 40 feet in length and has a fiberglass hull. The officers and crew on board the PANORMOS did not receive any radio calls from the fishing vessel. No officer or crew member on board the PANORMOS was aware of any contact between that vessel and any other vessel or object.

The evidence will show that the plaintiff violated a number of the International Navigational Rules, 33 USC Section 1602 (the "Rules of the Road") applicable to vessels transiting the area where the collision occurred. By proceeding northbound in the southbound traffic lane, the plaintiff violated Rule 10, which requires vessels in a traffic lane to proceed in the general direction of the traffic flow for that lane. The significance of the plaintiff's improper conduct in this respect is heightened by the fact that he was aware at the start of this particular tow that he had set a course that put his vessel on a path toward an oncoming vessel in the traffic lane.

When the engine alarm sounded on board the REBECCA NICOLE, and during the following 13 minutes that his brother was tending to the loose hose clamp problem, the plaintiff was aware that the other vessel was proceeding toward the REBECCA NICOLE without any apparent change in course or speed. In these circumstances, the plaintiff's decision to throttle back and then shutdown the fishing

vessel's engine, placing her in the path of the oncoming vessel, and his decision to remain in that position with the engine off until contact with the oncoming vessel was imminent and unavoidable constituted a failure to exercise reasonable care and a violation of Rule 7, which requires each vessel to use all available means to determine if a risk of collision exists.

The plaintiff's failure to sound the danger signal with the fishing vessel's horn was a violation of Rule 34, which requires a vessel, when in sight of another vessel, to make appropriate maneuvering or warning signals.  Given his knowledge of the approaching vessel, the plaintiff's failure to take available action, such as adding coolant to the engine immediately and maneuvering the vessel safely out of the traffic lane and the path of the oncoming vessel, constituted a violation of Rule 8, which requires a vessel to take appropriate action to avoid collision.

Plaintiff's Alleged Damages.  The plaintiff seeks to recover damages for the costs associated with the repair of the REBECCA NICOLE, which he contends were performed over the period February 21 through May 1, 2003 (the "repair period"), and for loss of use of the vessel during that period.  The plaintiff also seeks to recover future damages based on his contention that the Individual Fishing Quota ("IFQ") he will be assigned under an amendment ("Amendment 11") to the Atlantic Sea Scallop Fishery Management Plan will be less than he would have been assigned if he had been able to fish during the repair period, and, as a result, that he will suffer damages in the form of lost future profits or diminution in the value of his IFQ permit.

The evidence will demonstrate that the plaintiff's alleged future damages associated with the implementation of Amendment 11 are, *inter alia,* too speculative and too remote to be recoverable in this action and that the collision in issue was not the proximate cause of the plaintiff's alleged future damages.  At the time of the incident in February 2003, the plaintiff held a General Category scallop permit, which entitled him to fish for scallops and set a per-trip catch limit of 400 pounds of scallop meats.  He could make no more than one trip per day, and all sales of scallops were to be made to federally licensed dealers, who were required to submit copies of all sales receipts to the National Marine Fisheries Service ("NMFS").  The plaintiff was also required to submit a Vessel Trip Report ("VTR") on a federally prescribed form for each of his fishing trips.  A second type of scallop fishing permit, a Limited Access permit, was also available.  The Limited Access permits are held by larger vessels, and this permit allows vessels to remain at sea for more than one day per trip and provides for larger per-trip catch limits.

Under Amendment 11, no new General Category permits will be issued, the number of existing General Category permits will be reduced (by withdrawing the permits issued to vessels that did not land at least 1000 pounds of scallop meats during at least one year during the "qualifying period" beginning March 1, 2000 and ending on November 1, 2004).[1]  As discussed below, each remaining qualifying

---

[1] The "fishing year" for scallops begins on March 1 and ends on the last day of February.

vessel's "contribution percentage" will be determined by the New England Fisheries Management Council ("NEFMC").    Once the "contribution percentage" of a particular qualifying vessel has been determined, that vessel's IFQ (in pounds) for a particular year may be determined by multiplying the total allowable catch ("TAC") for that year by the contribution percentage.

Determining a qualifying vessel's "contribution percentage" under Amendment 11 involves a number of calculations based on a number of different factors.  The initial step requires identification of a particular vessel's "best year" catch, i.e., the year during the qualifying period that the vessel landed the greatest number of pounds of scallop meats.  Next, the vessel's "index factor" must be determined.  This is based on the number of years the vessel was actively engaged in the fishery during the qualifying period and is weighted to favor those with the longest record of participation.  The next step is to determine a particular vessel's "contribution factor" by multiplying the vessel's best year catch by its index factor.  Under Amendment 11 in its present form, a particular vessel's "contribution percentage" will be derived by dividing that vessel's contribution factor by the sum of the contribution factors of all qualifying vessels.

The evidence will show that, although the method for determining an IFQ under the present version of Amendment 11 can be stated, the plaintiff cannot establish to the required degree of reasonable certainty any recoverable damages associated with this regulatory change.

First, it is impossible to know when the IFQ program will be implemented fully.     The evidence will show that although NEFMC hopes to complete the implementation process by the beginning of the 2009 fishing year, i.e., by March 1, 2009, no date certain for implementation of the IFQ program has been set.  Actual implementation for any qualifying vessel must await the final determination of the contribution factor and the contribution percentage of each and every other qualifying vessel, a process subject to appeal procedures set forth in the text of Amendment 11. In this regard, the evidence will show that the plaintiff himself has appealed the initial determination that his index factor is .875.

Second, whether or not the IFQ program is implemented for the 2009 fishing year, it is impossible to know what the plaintiff's, or any other qualifying vessel's, IFQ (in pounds) will be beyond the 2009 fishing year.  The evidence will show that, under the existing regulatory scheme, TACs for the scallop fishery will be established bi-annually by NEMFC.  The current version of Framework 19 establishes TACs for the 2008 and 2009 fishing years.  The evidence will demonstrate that Amendment 11 represents the NEMFC's first attempt to establish quotas for the general category permit holders, and the program itself has yet to be implemented fully.   In these circumstances, predictions regarding TACs for 2011, 2015, or any other future fishing year amount to speculation.

Third, plaintiff's claim for future damages associated with the implementation of Amendment 11 must, of necessity, incorporate the assumption that the regimen

established by the current version of the amendment will not only be implemented but will remain in place and unchanged during the period of time for which he seeks to recover damages. The evidence will demonstrate that on the date of the incident in issue, February 20, 2003, the current regulatory scheme had not been formulated. At the time, the only restrictions on the plaintiff's harvest of scallops consisted of the 400 pound per daily trip limitation. The substance of the current version of the regulatory scheme was not published for comment until late 2007, was not published as a final rule until April 2008, and has not yet been implemented fully. Projections of regulatory continuity and consistency into the future ignore the substantial changes envisioned by Amendment 11 and constitute conjecture that cannot support an award of future damages.

Fourth, plaintiff's claim for future damages associated with the implementation of Amendment 11 must include a projection of the price of scallop meats. The evidence will show, however, that the price of scallop meats varies significantly over time and that the price does not bear a direct relationship to the supply of the product.

The evidence will show that the plaintiff is unable to demonstrate that the casualty and subsequent repair period had a significant negative impact on his catch during the 2003 fishing year, which was his "best year" for purposes of calculating his contribution percentage. The evidence will show that the plaintiff did not use the REBECCA NICOLE to fish on a set schedule and that his decisions regarding when

to fish were based on his discretion and volition.  The evidence also demonstrates that during the 2003 fishing year, he made a total of 101 trips for scallops and that in the 2004 fishing year he made a total of 103 trips for scallops.  The differential is insignificant, and the evidence demonstrates that the casualty and repair period had no impact on the plaintiff's total catch for the 2003 fishing year.

Without conceding that plaintiff's alleged future damages are recoverable, and even if plaintiff were able to establish future lost profits from scallop fishing, he must mitigate his damages.  NEMFC projects that the IFQ system will result in reducing the absolute number of pounds a permit holder will be allowed to land per year and, as a corollary, the number of days the vessel will be engaged in the scallop fishery. The REBECCA NICOLE can be used to fish for other species, and the plaintiff would have both the opportunity and the obligation to use the vessel in this manner. The evidence will also show that the plaintiff is a college graduate, has earned money in other fields, and has the capacity to mitigate any alleged damages by earning income in fields other than fishing.

2.    Facts established by pleadings, stipulations or admissions of counsel

1.    At the time and at all times subsequent, the *Rebecca Nicole* was owned by the named plaintiff, Robert Keese.  The name of the *Rebecca Nicole* has since been changed to *Beggar's Banquet*, but has continued to have the official NMFS permit number 149011.
2.    At the time, the *Panormos* was owned and operated respectively by the other named defendants.
3.    On or about 1815 on February 20, 2003, the defendant vessel M/V *Panormos* made physical contact with F/V *Rebecca Nicole* in Atlantic Ocean in the general vicinity of Chatham, Massachusetts.

4.  Preceding the aforesaid physical contact, the defendant vessel M/V *Panormos* made no speed change, course change, or any other maneuver with the specific objective of avoiding physical contact with F/V *Rebecca Nicole*.

5.  During the period 1800 to 1830 (6:00 to 6:30 pm) Eastern Standard Time on February 20, 2003, the *Panormos* had the ability to alter her course to avoid impact with a vessel in the Traffic Separation Scheme having the size and characteristics of the *Rebecca Nicole*.

6.  During the period 1800 to 1830 (6:00 to 6:30 pm) Eastern Standard Time on February 20, 2003, it would have been safe and prudent for the *Panormos* to alter her course so as to provide a safe margin to avoid impact with a vessel in the Traffic Separation Scheme having the size and characteristics of the *Rebecca Nicole*.

7.  During the period 1800 to 1830 (6:00 to 6:30 pm) Eastern Standard Time on February 20, 2003, the *Panormos* had the ability to diminish her speed to avoid impact with a vessel in the Traffic Separation Scheme having the size and characteristics of the *Rebecca Nicole*.

8.  During the period 1800 to 1830 (6:00 to 6:30 pm) Eastern Standard Time on February 20, 2003, it would have been safe and prudent for the *Panormos* to diminish her speed so as to provide a safe margin to avoid impact with a vessel in the Traffic Separation Scheme having the size and characteristics of the *Rebecca Nicole*.

9.  Following the aforesaid physical contact, the defendant vessel, M/V *Panormos* made no speed change, course change, or any other maneuver with the objective of rendering assistance to F/V *Rebecca Nicole*.

10. The *Rebecca Nicole* did not make any scalloping voyages between February 20, 2003 and May 2, 2003.

11. Following the collision, repairs were performed to the vessel and the cost of those repairs amounted to $40,302.39.

3.  Contested issues of fact

1.  The comparative culpability of the parties for the collision.

2.  The effect of the collision upon the plaintiff's future rights to harvest scallops pursuant to federal permit.

3.  The nature and extent of the damage to the plaintiff's vessel proximately caused by the collision.

4.  The fair and reasonable cost of repairing such damage.

5.  The period of time the plaintiff was unable to use the REBECCA NICOLE to fish as a direct and proximate result of the collision and necessary repairs (the "loss of use period").

6.  Whether the plaintiff suffered any loss of profits during the loss of use period.

7.  Whether the plaintiff mitigated any such loss of profits, and, if so, to what extent.

8.  The amount of recoverable net profit, if any, the plaintiff lost during the 2003 fishing year as a direct and proximate result of the collision.

9.  If Amendment 11 is implemented fully in its present form, over what period of time will it remain in effect in its present form.

10. If Amendment 11 is implemented fully, what will the plaintiff's index factor be.

11. If Amendment 11 is implemented fully, what will the plaintiff's contribution percentage be.

12. If Amendment 11 is implemented fully, whether the plaintiff would have received a higher contribution percentage but for the collision and subsequent repairs.

13. Whether the plaintiff's total landings during the 2003 fishing year were less than they would have been but for the collision and subsequent repairs and, if so, the amount in pounds of the alleged lost catch.

14. If Amendment 11 is implemented fully, can the relevant TACs for future years beyond the 2009 fishing year be established with reasonable certainty, and, if so, what will those TACs be for the years involved.

15. If Amendment 11 is implemented fully, can the plaintiff's IFQs for future years be established with reasonable certainty, and, if so, what will those IFQs be for the years involved.

16. Whether the plaintiff has the ability to mitigate any alleged future damages associated with the implementation of Amendment 11, and, if so, to what extent.

4.  <u>Jurisdictional questions</u>

None.

5.  <u>Questions raised by pending motions</u>

None.

6.  <u>Issues of law, including evidentiary questions</u>

The parties are not aware of any unusual issues of law, but reserve the right to

submit a memorandum of law on such issues if any should arise.

7.      Requested amendments to the pleadings

        None.

8.      Additional matters to aid in the disposition of the action

        The parties have participated in two mediation sessions before Magistrate Judge Sorokin. The most recent session occurred on July 11, 2008. Although no settlement was reached during that session, progress was made, and the parties were under the impression that a third session with Judge Sorokin would be possible. With that in mind, subsequent to the last session, the parties have continued to exchange factual information and to engage in discussions regarding the possibility of settlement. The parties believe that a third and final mediation session with Judge Sorokin would be beneficial.

9.      Probable length of the trial

        3 days, assuming a 0900-1300 trial day schedule.

10.     Witnesses

        A.      Plaintiff

Robert Keese (plaintiff)
24 Barnhill Road
West Chatham, Massachusetts 02669
508-945-2216

Kevin McLaughlin (fact witness as to repairs)
D.N. Kelley & Son Inc. Shipyard
32 Water Street
Fairhaven, MA 02719
508-999-6266

Jonathan Wood (fact witness as to repairs)
Marine Safety Consultants, Inc.
26 Water St
Fairhaven, MA 02719
508-996-4110

Captain David Wood USCG (ret.)(expert as to liability)

16 Mount Vernon Street
Newport, Rhode Island 02840
401-932-2686

Paul Parker, Executive Director (expert as to damages)
Cape Cod Commercial Hook Fishermen's Association
210 Orleans Road
North Chatham MA 02650
(508) 945-2432

     B.     Defendant

     The defendants may call the following witnesses.

Daniel Georgianna, PhD, University of Massachusetts, Dartmouth, Massachusetts.
Captain Valiotis Fotios, Doiranis 54, Kalithea, Athens 176 73 Greece.
Second Officer Romeo C. Rivas, Phillipines.
Third Officer Randy F. Uson, Phillipines.
Second Engineer Konstantinos Benis, Dimitrakopoulou 96, Kalithea, Athens 176 76 Greece.
Robert Keese
Andrew Keese, 28A Elm Avenue, Monument Beach, MA.
Alane Inman, 28A Elm Avenue, Monument Beach, MA.
Ken Watts, 24 Barnhill Road, Chatham, MA.
Keeper of Records, National Marine Fisheries Service, Fisheries Statistics Office, One Blackburn Drive, Gloucester, MA

11.    Exhibits

     A.     Plaintiff

1.    Repair records and bills relating to collision damage
2.    Scallop sales records before and after downtime reflecting prices paid
3.    Scallop sales records reflecting current prices paid to plaintiff
4.    NMFS letter dated June 20, 2008 regarding scalloping permit to *Beggar's Banquet* and any updating correspondence
5.    Federal Register publication of Amendment 11 and associated NMFS documents relating to calculation of IFQs
6.    C.V. of Captain Wood
7.    C.V. of Paul Parker
8.    Any exhibits identified by defendant

    B.    <u>Defendant</u>

1.    Vessel Trip Reports produced by plaintiff in discovery.
2.    Handwritten "share sheets" produced by plaintiff in discovery.
3.    Dealer Sales Records produced by plaintiff in discovery.
4.    Plaintiff's federal and state tax returns for the years 2002 through 2007.
5.    Marine Safety Consultant, Inc. Condition & Value Survey Report, with
       enclosures, dated May 12, 2003.
6.    DOC/NOAA/NMFS Systems Management Development Section 2002-2007
       Sea Scallop Landings for the F/V REBECCA NICOLE #149011 from Vessel
       Trip Reports (previously provided by plaintiff).
7.    DOC/NOAA/NMFS Systems Management Development Section Dealer
       Weightout Data (previously provided by plaintiff).
8.    Correspondence dated June 20, 2008, from DOC to the plaintiff setting forth
       his contribution factor.
9.    Deck Log for the PANORMOS, previously produced in discovery.
10.   Bell Book for the PANORMOS, previously produced in discovery.
11.   Engine Log for the PANORMOS, previously produced in discovery.
12.   BA Chart 2492, previously produced in discovery.
13.   NOAA Chart 14003.
14.   Correspondence from the Master of the PANORMOS, previously produced in
       discovery.
15.   Amendment 11, Final Rule.
16.   Framework 19, Final Rule.

12.     <u>Parties' positions on remaining objections to the evidence in Rule 26(a)(3) disclosures</u>

     A.     <u>Plaintiff</u>

N/A

     B.     <u>Defendant</u>

N/A

| | |
|---|---|
| **M/V *PANORMOS*; MARMARAS NAVIGATION, LTD;** and **BANTEL SHIPPING COMPANY LTD** <br> By their attorneys, | **ROBERT F. KEESE III** <br> By his attorneys, |
| ___/s/ John J. Finn_____ <br> John J. Finn**,** BBO# 166060 <br> FINN & FINN <br> 34 Chamberlain Street <br> Hopkinton, Massachusetts 01748 <br> Tel: 508-497-5019; fax: 508-479-5190 | ___/s/ Michael J. Rauworth_____ <br> Michael J. Rauworth,  BBO# 547711 <br> **CETRULO & CAPONE LLP** <br> World Trade Center East — 10th Floor <br> Two Seaport Lane <br> Boston, Massachusetts 02210 <br> Tel: (617) 217-5219; fax: 617-217-5200 |